**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| VICTOR R., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )       1:24CV205 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Victor R., brought this action pursuant to the
Social Security Act (the "Act") to obtain judicial review of a
final decision of Defendant, the Acting Commissioner of Social
Security (the "Commissioner"), denying Plaintiff's claim for
Disability Insurance Benefits ("DIB").  (Docket Entry 1.)
Defendant has filed the certified administrative record (Docket
Entry 3 (cited herein as "Tr. __")), and both parties have
submitted dispositive briefs in accordance with Rule 5 of the
Supplemental Rules for Social Security Actions under 42 U.S.C.
§ 405(g) (Docket Entry 7 (Plaintiff's Brief); Docket Entry 8
(Commissioner's Brief)).  For the reasons that follow, the Court
should remand this matter for further administrative proceedings.

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on
November 30, 2024.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Carolyn W. Colvin should substitute for Martin J. O'Malley as the
defendant in this suit.  No further action need be taken to continue this suit
by reason of the last sentence of Section 205(g) of the Social Security Act, 42
U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB on April 11, 2020 (Tr. 302-11), alleging disability since March 13, 2020 (see Tr. 302, 305). Upon denial of that application initially (Tr. 98-120, 144-52) and on reconsideration (Tr. 121-31, 154-58), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 159-60). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 63-83.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (See Tr. 134.)[2] The Appeals Council granted Plaintiff's request for review (Tr. 132-38; see also Tr. 59-61, 444-45 (request for review)), and remanded the case for the ALJ to consider new and material "evidence consist[ing] of a Medical Source Statement from Sherry A. Smith, Ed.D., LCSW/Cape Fear Behavioral Health Center, LLC (Dated: October 23, 2021; 6 pages), which indicate[d] that the claimant . . . [wa]s 'seriously limited,' 'unable to meet competitive standards,' or ha[d] 'no useful ability to function in' most areas of 'Mental Abilities and Aptitudes Needed to do Unskilled Work'" (Tr. 134 (referencing Tr. 1674-79) (quoting Tr. 1675)).

The ALJ held a second hearing, attended by Plaintiff, his attorney, and a different VE. (Tr. 40-57.) The ALJ subsequently issued a decision finding Plaintiff not disabled. (Tr. 14-39.)

---

[2] That decision does not appear in the record.

The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 299-301), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2025.

2. [Plaintiff] has not engaged in substantial gainful activity since March 13, 2020, the alleged onset date.

. . .

3. [Plaintiff] has the following severe impairments: degenerative disc disease with chronic lower back pain; obesity; vertigo due to inner ear disorder; tinnitus with hearing loss; ulnar entrapment, status-post surgery; chronic migraines; post-traumatic stress disorder (PTSD); and adjustment disorder with depressed mood.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . . with the following provisions: frequent climbing of ramps and stairs, balancing, kneeling, crouching, and crawling; occasional climbing of step ladders up to four feet in vertical height but none higher; no climbing of ropes or scaffolds; avoid concentrated exposure to workplace hazards (as defined in the Selected Characteristics of Occupations (SCO)) and to no[i]se levels greater than moderate (as defined in the SCO) due to a history of migraines; ability to understand, remember, and carry out instructions for simple, routine tasks not at production pace (i.e. not subject to strict time deadlines and/or quota requirements); ability to maintain concentration,

3

persistence, and pace for two-hour segments for completion of simple, routine tasks (assuming normal 15-minute morning and afternoon breaks and a 30-minute lunch break); frequent interaction with supervisors; occasional interaction with coworkers; no interaction with the public; ability to adapt to workplace changes involving simple, work-related decisions.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from March 13, 2020, through the date of th[e ALJ's] decision.

(Tr. 19-31 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for further administrative proceedings.

4

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

5

[Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a

_____

[3] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

6

'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment

---

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

7

is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC")." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, (continued...)

8

## B. Assignment of Error

Plaintiff's first and only assignment of error argues that "[t]he ALJ failed to adequately account for the vocationally limiting effects of Plaintiff's well documented chronic migraine headaches in the RFC." (Docket Entry 7 at 4 (bold font and block formatting omitted).)  In particular, Plaintiff points to his testimony that "he suffered from chronic migraine headaches and . . . his doctors had been trying him on different medications and different dosing" (id. (citing Tr. 50)), as well as that "[h]e was experiencing headaches about two to three times per week, suffering a severe one where he had to totally shut down once per week," when he could not "do anything" and "ha[d] to go into a dark room and lay [sic] down . . . and just wait for [his injection] to take the edge off" (id. at 4-5 (citing Tr. 50-51)).  Plaintiff further notes that "[t]he [VE] testified that [Plaintiff] could not be off task from working for more than 5-10% at a time nor could he be absent from work in an unskilled setting more than 10 days per year and remain employable."  (Id. at 5 (citing Tr. 55).) According to Plaintiff, "despite acknowledging that [Plaintiff]'s records reflected that he suffered from chronic migraine headaches with sensitivity to light and noise" (id. (citing Tr. 27)), "the ALJ only included a limitation to 'moderate' noise in the RFC" (id.

---

<sup>6</sup> (...continued)
review does not proceed to the next step.").

9

(quoting Tr. 25)), and "d[id] not explain why . . . no light limitation was included in the RFC" (id.), or "why she did not make an allowance for absences or time off task in the RFC" (id. at 6). For the reasons that follow, those contentions have merit and warrant remand.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c). An ALJ need not discuss every piece of evidence in making an RFC determination, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014); however, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted). Here, as the following discussion will show, the ALJ failed to adequately explain why she omitted

10

limitations on light exposure, time off-task, and absences from the RFC.

To begin, the ALJ acknowledged Plaintiff's subjective complaints of "ongoing issues with vertigo, dizziness, and balance, which ha[d] been less since ear surgery but still problematic especially with migraines," as well as his reports of "migraine headaches two to three times per week" with "episodes that cause [him] to completely shut down for a day, where [he] c[ould ]not do anything but go into a dark room." (Tr. 26 (referencing Tr. 49-51).) The ALJ then found Plaintiff's subjective symptom reports "not entirely consistent with the medical evidence and other evidence in the record <u>for the reasons explained in th[e ALJ's] decision</u>" (<u>id.</u> (emphasis added)) but, contrary to that statement and, as explained in more detail below, did not thereafter sufficiently explain why the ALJ discounted Plaintiff's subjective reports of migraine symptoms, which requires remand, <u>see</u> <u>Myers v. Saul</u>, No. 1:20CV420, Docket Entry 16 at 8 (M.D.N.C. July 2, 2021) (unpublished) (Webster, M.J.) ("[T]he ALJ appears to endorse [the p]laintiff's testimony that she is sensitive to light, noise, and odors, but then - without adequate explanation - only includes a noise limitation in the RFC. This alone is reversible error requiring a remand." (internal citation omitted)), <u>recommendation adopted</u>, slip op. (M.D.N.C. July 20, 2021) (Biggs, J.).

In an effort to avoid that outcome, the Commissioner contends that "the ALJ noted . . . [that] Plaintiff remained able to prepare simple meals, attend college classes and study, pay bills, drive, shop, care for pets and take them to the veterinarian, take medications with simple reminders, perform various household chores, use a computer, as well as make home repairs, handle finances, and perform personal care activities." (Docket Entry 8 at 19 (citing Tr. 24 (in turn referencing Tr. 48, 75, 382-84, 390-92)).) In the Commissioner's view, Plaintiff's ability "to perform a wide range of activities despite his symptoms . . . undermines Plaintiff's claims regarding the frequency and severity of his migraines." (Id. at 18-19 (quoting Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011), for proposition that ALJ's "decision must be read 'as a whole,' as opposed to in isolated parts")).) That contention fails for two reasons.

First, the ALJ discussed Plaintiff's ability to engage in daily activities only at step three of the SEP as part of the ALJ's discussion finding that Plaintiff's <u>mental</u> impairments caused moderate (but not listing level) limitations in all four broad areas of <u>mental</u> functioning (<u>see</u> Tr. 23-25), without thereafter even mentioning Plaintiff's daily activities in the discussion of Plaintiff's RFC (<u>see</u> Tr. 25-29). Although the Court may consider the ALJ's decision "as a whole," <u>see</u> <u>Smith</u>, 457 F. App'x at 328, the Court cannot supply post-hoc reasoning the ALJ failed to

12

provide in the first instance, see Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (unpublished) (Osteen, Jr., C.J.) ("Under th[e Chenery] doctrine, a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency[, and i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" (quoting Securities & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947)).

Second, although an ability to engage in a wide range of activities might undermine a claimant's subjective report that an ongoing impairment limited his or her ability to function, i.e., a claimant's consistent ability to shop in a store for two hours might undermine his or her testimony that constant, unrelenting back pain limited him or her to 15 total minutes of walking in an eight-hour day, that ability carries much less significance when applied to intermittent impairments like Plaintiff's migraine headaches. Because the ALJ both acknowledged and failed to expressly discredit Plaintiff's testimony that he experienced a severe migraine at least once a week that caused him to completely shut down and lie down in a dark room (see Tr. 25-29, 50-51), the possibility existed that Plaintiff engaged in those daily activities on days when he did not experience a severe migraine. See Andreha U. v. Kijakazi, No. 1:21CV302, 2022 WL 4465591, at *11

13

(D. Idaho Sept. 26, 2022) (unpublished) ("[T]he ALJ's reference to [the plaintiff]'s reported physical activities do not supply the [c]ourt with any further insight into the ALJ's reasoning.  The ALJ noted that [the plaintiff] was independent in all activities of daily living, could walk up to four miles a day, and reported playing Frisbee golf.  However, the ALJ did not explain how these activities contradict [the plaintiff]'s reports of frequent migraine headaches accompanied by pain, nausea, vomiting, blurred and double vision. . . .  [The plaintiff] testified that, when she is suffering a migraine, she is unable to engage in any activity – indeed, she stated in both headache questionnaires that headache symptoms required her to lie in bed with the lights off until symptoms abate.  Presumably, when [the plaintiff] is not experiencing a migraine, she would be able to perform activities of daily living and engage in physical activity. . . .  But, the ALJ failed to discuss how the intermittent nature of [the plaintiff]'s migraines conflicted with her daily activities on days when she was not experiencing a migraine.  Nor does the ALJ's reasoning address the heart of the issue, which concerns absenteeism related to migraine headache symptoms."); Colie v. Saul, No. 4:18CV107, 2019 WL 4619517, at *7 (E.D.N.C. Aug. 13, 2019) (unpublished) ("While [the] plaintiff's migraines could plausibly prevent her from performing certain of the[ daily] activities [relied on by the ALJ] when [the plaintiff] is experiencing migraines, it is less clear

14

that she would be prevented from performing them . . . on a continuous basis due to her migraines given their intermittent nature. [ A]ccording to [the] plaintiff's own accounts, she is migraine free about 20 days of each month."), <u>recommendation adopted in part, rejected in part on other grounds</u>, 2019 WL 4580371 (E.D.N.C. Sept. 20, 2019) (unpublished); <u>Biller v. Astrue</u>, No. 1:09CV1763, 2010 WL 5481746, at *8 (N.D. Ohio Dec. 8, 2010) (unpublished) ("[I]t is not clear how [the p]laintiff's daily activities were inconsistent with her alleged disabling migraine headache pain. The ALJ explained that [the p]laintiff's ability to perform daily household chores, care for five children, drive, shop, and handle finances were extensive and belied [the p]laintiff[']s allegations of disabling pain. [The p]laintiff[']s daily activities, however, were not necessarily inconsistent with her allegations. Indeed, [the p]laintiff testified that she could care for herself only as long as she did not suffer a migraine, that she suffered dysfunction from her migraines two to three times a week, and, when she suffered migraines, her parents took care of her children. The ALJ should have explained how these daily activities . . . were inconsistent with being disabled at least three days a week." (internal quotation marks and citations omitted)), <u>recommendation adopted</u>, 2011 WL 9187 (N.D. Ohio Jan. 3, 2011) (unpublished). Thus, the ALJ's evaluation of Plaintiff's

15

subjective symptom reporting does not explain the absence of off-task time and absence limitations in the RFC.

The ALJ's evaluation of the medical evidence of record relating to Plaintiff's migraines similarly does not elucidate the ALJ's reasoning with regard to Plaintiff's migraine-related limitations in the RFC. In that regard, the ALJ provided the following discussion:

> [Plaintiff]'s medical history is remarkable for . . . persistent migraines (approximately four to seven days per week), which were [] associated with ongoing effects of . . . nausea, vomiting, . . . and/or sensitivity to light and sound. . . . [Plaintiff] . . . was trialed on several medications for stabilization but was not always compliant with medication use and often denied other modalities, such as Botox injections. . . . In September 2020, [he] reported no greater than two to three migraines per week that were not of severe intensity. In December 2020 and April 2021, [he] reported that medications, such as Aimovig and Imitrex, were working to stop migraines and that migraine frequency was up to about two to three per week with a pain rating of six (on a scale of one to 10). In July 2021, [he] reported increased migraines, three to four per week, which was attributed to dealing with home-related issues . . . . By the following month, [he] reported improvement in headaches, to include decreased pain levels and less intensity. [He] also denied a need for Imitrex over the past month. In October 2021, [he] reported decreased frequency of headaches, although Imitrex was not needed the prior month and needed only once in the current month. As of January 2022, [he] endorsed an average of approximately three migraines per week with an average pain level of five and lasting less than 24 hours. During the period of March through September of 2022, [he] endorsed fluctuating improvement in migraines/headaches but frequently indicated that medications were effective, as [he] typically experienced less episodes per week, with only one episode per week being severe and requiring Imitrex. In August 2022, [he] specifically reported having one severe migraine every

16

> 10+ days (equivalent of two to three per month), which
> was attributed to increased stress.

(Tr. 27 (emphasis added).)

As argued by Plaintiff, the ALJ here "simply summarize[d the applicable] medical evidence, [and then] fail[ed] to provide a logical bridge between that evidence and the RFC conclusions." (Docket Entry 7 at 8 (citing Funderburk v. Astrue, No. 2:10CV852, 2012 WL 904682, at *5 (M.D. Ala. Mar. 15, 2012) (unpublished) ("The ALJ's verbatim regurgitation of the medical record does not satisfy the ALJ's obligation to state the reasons for his decision in understandable language, as required by law[.]")).) Indeed, Plaintiff correctly notes that, "per the ALJ's own recitation of the evidence, she should have included two to four absences per month in the RFC as this was the frequency of severe migraines [Plaintiff] was still experiencing in 2022 despite years of treatment with trials on various medications." (Id. (internal parenthetical citation omitted) (citing Tr. 27).) As the United States Court of Appeals for the Fourth Circuit recently emphasized in an unpublished opinion:

> [The plaintiff] contends the ALJ failed to adequately
> explain why the limitations included in the RFC
> sufficiently accounted for [the plaintiff's] headaches.
> Most significantly, she contends the ALJ erred by not
> making specific findings regarding how often [the
> plaintiff] would be absent from work due to the frequency
> and severity of her headaches. We agree. The [VE]
> testified a hypothetical person would be precluded from
> maintaining full time employment if she were absent more
> than once a month. The record shows that, even after
> receiving treatment that reduced the frequency of her

17

> headaches, [the plaintiff] still reported getting
> headaches about once a week. And although [she] told her
> physicians the severity of her headaches had lessened
> with treatment, the record does not establish whether her
> headaches nevertheless remained severe enough to cause
> her to be absent from work when they occurred. The ALJ
> did not make specific factual findings on that point.
> The ALJ's failure to reach an "express conclusion in the
> first instance" on the potentially dispositive issue of
> whether the frequency and severity of [the plaintiff]'s
> headaches would cause her to be absent from work more
> than once a month — or to explain how, despite any
> potential absences, the evidence supported [the ALJ's]
> finding that the limitations included in the RFC
> sufficiently accounted for [the plaintiff]'s impairments
> — is an error of law that necessitates remand.

Woody v. Kijakazi, No. 22-1437, 2023 WL 5745359, at *1 (4th Cir.
Sept. 6, 2023) (unpublished) (emphasis added) (citing Dowling v.
Commissioner of Soc. Sec. Admin., 986 F.3d 377, 388 (4th Cir.
2021), and Thomas v. Berryhill, 916 F.3d 307, 311-12 (4th Cir.
2019)); see also John F. M. v. Kijakazi, No. 1:23CV126, 2023 WL
6057500, at *17 (D.S.C. Sept. 18, 2023) (unpublished) ("[The ALJ]
failed to resolve conflicting evidence as to the frequency and
duration of [the p]laintiff's migraines and their limiting effects.
The record reflect[ed the p]laintiff's reports to his medical
providers of migraines that occurred as often as daily and as
infrequently as twice a month . . . Assuming the ALJ found [the
p]laintiff's migraines were resolved by taking Imitrex and a nap,
[the ALJ] did not explain how often and how long [the plaintiff]
would be incapacitated and how this would affect his ability to
complete a normal workday and workweek. [The p]laintiff
testified . . . that if he took medication immediately upon

18

noticing his sinuses starting to constrict, his migraine might last only a few hours, but if he waited to take his medicine until the light and noise started to bother him, he would be down for at least eight hours. Even if [the p]laintiff required only a few hours of rest away from the workstation when experiencing a migraine, he would still be off-task for some portion of the workday."); Myers, No. 1:20CV420, Docket Entry 16 at 12 ("[T]he ALJ goes straight from listing th[e medical] evidence to setting forth [the p]laintiff's RFC, which accommodates some of [her] alleged limitations (phonophobia) but omits others (photophobia, absenteeism) making it impossible to trace the logical path of [the ALJ's] reasoning.").

The Commissioner points to the ALJ's observation "that Plaintiff 'was not always compliant with medication use and often denied other modalities, such as Botox injections'" as supportive of the ALJ's RFC. (Docket Entry 8 at 10 (quoting Tr. 27).) That statement by the ALJ, however, does not provide much support for the ALJ's omission of additional migraine-related limitations from the RFC for two reasons. First, the ALJ failed to provide pinpoint citations to the record to support her finding of noncompliance, instead listing a string citation to support her entire analysis of Plaintiff's treatment for inner ear disorders and migraine headaches. (See Tr. 27.) Moreover, the undersigned's review of the record disclosed only two occasions on which Plaintiff did not

19

_immediately_ try medications prescribed by his neurologist, but ultimately _did start taking them as prescribed_. (See Tr. 870-73 (documenting Plaintiff's report, _prior to alleged onset date_, that he had not yet tried prescribed Imitrex, as well as his use of that injection by next visit), 1847-50 (recording Plaintiff's initial failure to take propanolol as requested, and his use of that medication by next office visit).) Thus, the record does not support a finding of migraine medication noncompliance by Plaintiff. Second, in view of the multiple medications Plaintiff took in an unsuccessful effort to abate his migraine symptoms (_see_ Tr. 865 (describing Maxalt as "hit or miss"), 1228 (listing Pamelor and Topamax as "failed" medications), 1638 (documenting Elavil, Prozac, Trokendi, Reglan, Maxalt, and Excedrin as unsuccessful medications)), his decisions to decline valproic acid and injections such as Botox, Ajovy, and Emgality on three occasions (_see_ Tr. 1229, 1937, 1944) provide an insufficient basis for omitting additional migraine-related limitations in the RFC. In sum, the ALJ's discussion of the medical evidence does not adequately explain her omission of light exposure, time off-task, and absence limitations from the RFC.

The ALJ's discussion of the opinion evidence similarly does not sufficiently support the absence of such limitations in the RFC. As the Commissioner points out (_see_ Docket Entry 8 at 11-12), the state agency medical consultants did not include limitations on

20

light exposure, off-task time, or absences in their RFC opinions (see Tr. 109-12 (initial-level consultant's RFC precluding even moderate exposure to hazards due to migraines), 125-26 (reconsideration-level consultant's RFC restricting concentrated exposure to noise and hazards because of migraines)).  However, contrary to the Commissioner's assertion that the ALJ "adopted an additional restriction on the noise level Plaintiff could experience on the job" (Docket Entry 8 at 12 (citing Tr. 25)), the ALJ, who found the consultants' opinions only "somewhat persuasive" (Tr. 29), did _not_ include any additional, migraine-related limitations in the RFC, but merely rephrased the reconsideration-level consultant's concentrated exposure to noise limitation as a restriction of "concentrated exposure to . . . no[i]se levels greater than moderate (as defined in the SCO)" (Tr. 25 (emphasis added)).  Even more significantly, the consultants did not discuss the frequency or severity of Plaintiff's headaches or offer _any_ explanation for the lack of light exposure, off-task time, or absence limitations (see Tr. 104-05, 108-12, 122-23, 125-27), despite finding Plaintiff's migraines a severe impairment (see Tr. 105, 124) and repeatedly acknowledging Plaintiff's diagnosis of "intractable" migraine headaches (Tr. 104, 109-10, 112, 122, 126-27).  Thus, the consultants' _unexplained_ omission of limitations on light exposure, off-task time, and absences provides little support for the ALJ's omission of such limitations from the RFC.  See _Frank_

21

G. v. Commissioner of Soc. Sec., No. 5:17CV103, 2019 WL 430887, at
*7 (D. Vt. Feb. 4, 2019) (unpublished) ("[T]o the extent that the
Commissioner claims the [state agency] physicians' opinions were
consistent with a finding that [the p]laintiff could perform
frequent head movements, the opinions were consistent with this
conclusion only to the extent that they were silent on the issue."
(emphasis added) (internal quotation marks and ellipsis omitted)).

Lastly, the Commissioner deems "th[e] Court's recent decision
in *Latisha G. V. O'Malley*, No. 1:22-cv-793, 2024 WL 1142651
(M.D.N.C. Mar. 15, 2024) [(unpublished)] (Peake, M.J.), []
instructive." (Docket Entry 8 at 13.) According to the
Commissioner, in Latisha G., the Court rejected the plaintiff's
"argu[ment] that the ALJ erred because he adopted a noise
limitation but omitted other RFC limitations related to migraines,
such as light avoidance, time off task, or absences" (id. (citing
Latisha G., 2024 WL 1142651, at *3)), because "the ALJ found that
the [plaintiff] had received routine and conservative treatment for
migraines, she showed improvement on medication, and she remained
able to perform a range of daily activities" (id. at 13-14 (citing
Latisha G., 2024 WL 1142651, at *5)) and "'none of [the
p]laintiff's providers or other medical sources opined that [the
p]laintiff's headaches caused any limitations at all'" (id. at 14
(citing Latisha G., 2024 WL 1142651, at *6)). Critical factual
differences, however, distinguish Latisha G. from this case.

22

First, in <u>Latisha G.</u>, the ALJ's discussion of the plaintiff's treatment for migraine headaches made clear that medication improved the plaintiff's headaches, which her provider found "'<u>not intractable</u>,'" to the point that the plaintiff no longer took that medication and did not report any headaches for nearly a full year until a change in medication for back pain triggered a new bout of headaches. <u>Latisha G.</u>, 2024 WL 1142651, at *4 (emphasis added). On the basis of that evidence, "the ALJ [expressly] found that the record regarding [the plaintiff's] headache[s] reflect[ed] routine and conservative treatment and improvement on medication." <u>Id.</u> at *5. Here, in contrast, the ALJ recited medical evidence showing Plaintiff's consistent complaints of frequent, <u>intractable</u> migraine headaches both prior to and throughout the relevant period in this case, with minor fluctuations in the severity and frequency of those headaches and without any sustained period of remission despite multiple changes in medications and dosages. (<u>See</u> Tr. 27.) Thereafter, unlike the ALJ in <u>Latisha G.</u>, the ALJ neither deemed Plaintiff's headache treatment routine and conservative nor made any finding that Plaintiff's headaches improved on medication. (<u>See</u> Tr. 27-29.)

Second, the ALJ in <u>Latisha G.</u> explicitly tied the plaintiff's ability to engage in daily activities to the ALJ's analysis of the intensity, persistence, and limiting effects of Plaintiff's symptoms. <u>See Latisha G.</u>, 2024 WL 1142651, at *5. In contrast

23

and, as discussed above, the ALJ here discussed Plaintiff's daily activities only in the context of the impact of her mental impairments on her ability to function mentally (see Tr. 23-24), and did not thereafter mention those activities in the RFC discussion (see Tr. 25-29).

Third, the ALJ in Latisha G. noted that the plaintiff did not allege headaches as a disabling impairment on her initial Disability Report and Function Reports. See Latisha G., 2024 WL 1142651, at *6. Here, the ALJ did not rely on the fact that Plaintiff's initial Disability Report failed to list disabling headaches. (See Tr. 25-29.) Moreover, Plaintiff's Function Report asserted that he suffered from three to four migraines per week with at least one per week which caused him to "shut down." (Tr. 381.)

Fourth, the plaintiff in Latisha G. did not testify that her headaches would cause her to miss two or more days of work per month, making her argument that the ALJ erred by failing to include that limitation in the RFC "nothing more than conjecture." Latisha G., 2024 WL 2112651, at *6. In contrast, Plaintiff here testified that he suffered from at least one migraine per week which caused him "to totally shut down" (Tr. 50), which he further described as his inability to "do anything" and "hav[ing] to go into a dark room and lay [sic] down . . . and . . . give [himself a shot and just wait for it to take the edge off" (Tr. 51). Plaintiff further

24

stated that, "if [he was] lucky, [the headache would] last a couple of hours," but "if [he was] not, it[ would] last a day or two days." (Id.)  That testimony placed the issue of migraine-related time off-task and absence squarely before the ALJ and out of the realm of "conjecture," Latisha G., 2024 WL 1142651, at *6.

Given all of these considerations, the Court should conclude that the ALJ failed to "identify evidence that support[ed the omission of limitations on light exposure, off-task time, and absences in the RFC] and [to] build an accurate and logical bridge from that evidence to [the RFC]," Woods, 888 F.3d at 694, leaving the Court to "guess about how the ALJ arrived at his conclusions," Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015).  Accordingly, the Court should remand this case for further consideration of Plaintiff's migraine-related limitations.[7]

---

[7] Plaintiff asks the Court for "revers[al]" of the ALJ's decision "for an award of benefits per the VE's testimony regarding the work preclusive effect of recurrent absences (more than 10 unscheduled per year)." (Docket Entry 7 at 12.) In this case, the Court should opt for remand, because the record does not compel a finding that Plaintiff's migraine headaches would have caused him to miss more than 10 days of work in a year, and remand constitutes the proper course when ambivalence exists in the medical record and the ALJ failed to provide an adequate explanation, see Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) ("conclud[ing] that the district court abused its discretion in directing an award of benefits rather than remanding for further explanation by the ALJ [where] . . . [t]he ALJ's decision . . . [wa]s devoid of reasoning").

### III. CONCLUSION

Plaintiff has established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, and that this matter be remanded under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, to include re-evaluation of the impact of Plaintiff's migraine headaches on his RFC, with an express discussion of his ability to tolerate exposure to noise and light, as well as his abilities to remain on-task and maintain attendance at work.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

January 6, 2025

26